United States District Court
Southern District of Texas
**ENTERED**
November 07, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JEAN W. et al., § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | CIVIL ACTION NO. 4:21-CV-3900 |
| § | |
| § | |
| BEACON HEALTH OPTIONS, et. al., § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court[1] are Plaintiffs Jean W., Alexis R., and Anthony R.'s (collectively, "Plaintiffs") Motion for Judgment on the Record and Defendant Shell Oil Company Comprehensive Welfare Benefits Plan's (the "Plan") Cross-Motion for Judgment. (Dkt. Nos. 73, 84.) Based on the briefing, record, and relevant law, the Court **RECOMMENDS** Plaintiffs' Motion for Judgment on the Record (Dkt. No. 73) be **DENIED** and the Plan's Cross-Motion for Judgment (Dkt. No. 84) be **GRANTED**.

### I. BACKGROUND

a. The Parties

This case arises out of an Employee Retirement and Income Security Act ("ERISA") claim. (*See* Dkt. No. 57.) The Plan is an employer-sponsored welfare benefits plan governed by ERISA. (*Id.* at 1.) Shell Oil Company ("Shell") serves as the Plan Administrator for the Plan. (*Id.* at 1-2.) Former Defendant Beacon Health Options, Inc. ("Beacon") serves as the third-party claims'

---

[1] This case was referred to the Undersigned Magistrate Judge pursuant to 28 U.S.C. §636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. (*See* Dkt. No. 44.)

administrator for mental health and substance abuse treatment claims under the Plan. (*Id.* at 1.) Jean, a participant in the Plan, has two children: Alexis and Anthony. (*Id.*) Alexis and Anthony are beneficiaries of the Plan. (*Id.* at 1-2.)

      b. <u>The Plan's Procedures and Relevant Terms</u>

The Summary Plan Description provides a summary of the Plan's programs and procedures. (*See* Dkt. No. 74 at 1.) The Plan's Medical Benefit Program covers mental health and substance abuse treatment. (*Id.* at 18.) Coverage for mental health and substance abuse care is provided through the Beacon Health Options program. (*Id.* at 16.) Care may be obtained outside of the network through qualified and licensed providers if treatment is considered medically necessary and appropriate. (*Id.* at 17.)

"Custodial care is not covered under the [Hospital Surgical Medical ("HSM")] options, except in conjunction with hospice care." (*Id.* at 26.) The Plan has two custodial care definitions. "Custodial Care (with respect to *Medicare*)" is defined as:

> Care that primarily helps a person meet personal hygiene needs or perform the activities of daily living, such as getting out of bed, bathing, dressing, eating, and administering medication. Custodial care may also include supervised living arrangements under which little or no medical, mental health, or substance abuse treatment is being rendered.

(Dkt. No. 75 at 48.) "Custodial Care (with respect to the Shell HSM options)" is defined as:

> Non-medically necessary personal health care, wherever furnished and by whatever name called, that is designed primarily to assist an individual in performing his or her activities of daily living. Such services include, without limitation, assistance in walking, getting in or out of bed, bathing, dressing, feeding, or using the lavatory, preparation of special diets, and supervision of medication schedules.

(*Id.*) The Plan does not cover expenses for "educational purposes or to enhance one's personal or professional growth, development, or training" or "[e]ducation, training, and room and board expenses while confined to an institution providing schooling or training." (Dkt. No. 74 at 34.)

Claims, which are defined as a request for a plan or program benefit by a participant or authorized representative, are initially submitted to the Claims Administrator, Beacon. (*Id.* at 26, 30, 43.) If the initial claim for benefits is denied, the claimant can request a "First-Stage Review" to be conducted by Beacon. (*Id.* at 31.) If the claim is denied on first-stage review, the claimant can make a "Second-Level Appeal" to the Plan Administrator, Shell. (*Id.*) At each stage of review, the claim is reviewed by a different individual who reviews the claim with no deference given to any prior benefits decision. (*Id.* at 32.) After completing the claims and appeals process, the claimant may bring legal action within two years of the date the claimant is notified of the final decision on appeal. (*Id.* at 36.)

    c. <u>Alexis</u>

From August 1, 2019 to December 31, 2019, Alexis attended Echo Springs Center ("Echo Springs"). (Dkt. No. 80-1 at 151.) Plaintiffs describe Echo Springs as a "24/7 intermediate behavioral health treatment facility . . . that provides intermediate behavioral health services to adolescents." (*Id.* at 41.) Plaintiffs requested payment under Revenue Code 1003, Supervised Living, for Alexis' stay at Echo Springs. (*Id.* at 134.) On April 23, 2020, Beacon denied Alexis' claim because "supervised living" was not a covered service under the Plan. (*Id.* at 18-19, 38-39.)

On July 29, 2020, Plaintiffs filed a first-level appeal with Beacon. (*Id.* at 33-45.) On August 17, 2020, Beacon upheld the initial determination to deny Alexis' claim because supervising living services was not a covered benefit under Plaintiffs' plan. (*Id.* at 134-35.)

On September 23, 2020, Plaintiffs submitted a second-level appeal request to the Plan. (*Id.* at 146-57.) The Plan requested the following information from Plaintiffs in order to conduct a comprehensive review of Alexis' case: (1) medical records, demonstrating what medical services Alexis received while staying at Echo Springs; (2) an itemized bill, reflecting separate charges for the services performed at the facility; (3) documentation that the services were performed pursuant to a qualified physician's authorization and determined to be medically necessary and appropriate; and (4) documentation that Plaintiffs were charged and paid the required copayment and deductible applicable to these services. (*Id.* at 19.)

On March 10, 2021, the Plan issued its Final Internal Benefit Determination declining to provide benefits for Alexis' claim. (*Id.* at 18.) The Plan explained that "[t]he documents provided [by Plaintiffs] did not reflect that medical treatment was provided to Alexis by Echo Springs." (*Id.* at 20.) The Plan also explained that, to the extent certain services Alexis received at Echo Springs were covered under the Plan, Plaintiffs failed to submit an itemized bill to allow the Plan to determine which charges were eligible for reimbursement. (*Id.* at 21.)

d. <u>Anthony</u>

From June 19, 2019 to March 31, 2020, Anthony attended Return to Excellence Academy ("Excellence Academy"). (Dkt. No. 76-1 at 253.) Plaintiffs describe Excellence Academy as a "transitional program for young adults." (*Id.* at 255.) Plaintiffs initially requested payment under Revenue Code 1001, Residential Treatment - Psychiatric, for Anthony's stay at Excellence Academy. (*Id.* at 332.) On December 12, 2019, Beacon denied Anthony's claim because the Excellence Academy "was not licensed by the state for Residential Treatment Center." (*Id.* at 253.)

On May 5, 2020, Plaintiffs filed a first-level appeal with Beacon. (*Id.* at 247-59.) On June 9, 2020, Beacon upheld the initial determination to deny Anthony's claim. (Dkt. No. 80-1 at 331-

35.) Beacon explained that the initial denial was correct because Excellence Academy billed for Residential Treatment Center services without being licensed to provide the service. (*Id.* at 332.) After the initial denial, Excellence Academy billed corrected claims under Revenue Code 1003, Supervised Living. (*Id.*) Despite this correction, Beacon still upheld the initial denial because supervised living services were not a covered benefit under Plaintiffs' plan. (*Id.*)

On July 31, 2020, Plaintiffs submitted a second-level appeal request to the Plan. (*Id.* at 25-36.) On September 1, 2020, the Plan notified Plaintiffs that it requested additional information from the Plan's service providers in order to conduct a full review of Plaintiffs' appeal. (*Id.* at 239.) On October 13, 2020, the Plan completed the full review of Anthony's appeal. (*Id.* at 243.) The Plan confirmed that Excellence Academy administered items beyond medical care but found that the facility also provided services for treatment of an underlying mental health condition. (*Id.*) In order to determine what charges were payable under the terms of the Plan, Plaintiffs were asked to submit the following information: (1) an itemized bill; (2) documentation that Anthony's stay at Excellence Academy was recommended and approved by a qualified physician acting within the scope of their license and that Anthony's stay at the facility was determined to be medically necessary and appropriate; and (3) documentation that Plaintiffs had been charged and paid the required copayment and deductible applicable to the treatment provided by Excellence Academy. (*Id.* at 243-44.)

On November 5, 2020, Plaintiffs submitted additional documents. (Dkt. No. 78-2 at 103-16.) On December 7, 2020, the Plan issued its Final Internal Benefit Determination for Anthony's claim. (*Id.* at 117-23.) The Plan approved partial payments of benefits for itemized individual psychotherapy sessions provided that Plaintiffs submitted proof of payment with respect to the approval charges within the designated timeframe. (*Id.* at 118-20.) The Plan denied benefits for

the remainder of the billed services because the invoice provided by Plaintiffs only showed bundled billed charges for services that were not eligible for reimbursement under the Plan. (*Id.* at 120-21.)

e. Procedural History

Plaintiffs filed this civil action under ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), against Beacon and the Plan. (Dkt. No. 57.) On April 24, 2023, Beacon filed a Motion for Judgment on the Pleadings. (Dkt. No. 64.) On September 15, 2023, United States District Court Judge Andrew Hanen granted Beacon's Motion and dismissed with prejudice all claims brought by Plaintiffs against Beacon. (Dkt. No. 83.)

On August 23, 2023, Plaintiffs filed a Motion for Judgment on the Record. (Dkt. No. 73.) On October 4, 2023, the Plan filed a Response in Opposition to Plaintiffs' Motion and Cross-Motion for Judgment. (Dkt. No. 84.)

II.  **STANDARD OF REVIEW**

A benefits plan participant may bring a civil action under ERISA § 502(a)(1)(B) "to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the plan." 29 U.S.C. § 1132(a)(1)(B). "When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion."[2] *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

---

[2] Both parties agree that the standard of review in this case is abuse of discretion. (Dkt. No. 73 at 3; Dkt. No. 84 at 3.)

A court applying the abuse of discretion standard analyzes whether the plan administrator acted arbitrarily or capriciously. *Meditrust Fin. Servs. Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 214 (5th Cir. 1999). A decision is not arbitrary and capricious if it is supported by substantial evidence. *Id.* "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010) (quotation marks omitted). A decision is arbitrary when it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence." *Meditrust*, 168 F.3d at 215 (quotation marks omitted).

"[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness—even if on the low end." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009) (quotation marks omitted). If a plan administrator's decision is "supported by substantial evidence and is not arbitrary or capricious, it must prevail." *Ellis v. Liberty Life Assur. Co.*, 394 F.3d 262, 273 (5th Cir. 2004).

### III.     DISCUSSION

Plaintiffs argue that the treatment Alexis and Anthony received was a covered benefit under the terms of the Plan. (Dkt. No. 73 at 13-19.) Conversely, the Plan contends that (1) Plaintiffs' arguments regarding Beacon's resolution of the initial claims and first-level appeal are no longer relevant and (2) the Plan did not abuse its discretion in denying Plaintiffs' second-level appeal. (Dkt. No. 84 at 13-17.)

a. Plaintiffs' Initial Claims and First-Level Appeal

The Plan argues that Plaintiffs' arguments regarding Beacon's resolution of the initial claims and first-level appeal are irrelevant because Beacon and the Plan performed a de novo review of Plaintiffs' claims at each stage of the claims review process. (*Id.* at 13.) Thus, the Plan contends that whether Plaintiffs are entitled to judgment on the record depends on the merits of the Plan's denial of Plaintiffs' second-level appeals. (*Id.* at 14.) In their Reply, Plaintiffs note that the Plan "introduced the same flawed logic" as Beacon into its final denial but devotes the rest of their briefing to addressing Plaintiffs' second-level appeals. (Dkt. No. 85 at 8-9.) The Court's review will focus on the Plan's decisions regarding Plaintiffs' second-level appeals.

b. Alexis' Second-Level Appeal

Plaintiffs contend that the evidence shows Alexis' stay at Echo Springs was medically necessary and that Beacon's decision was not supported by substantial evidence. (Dkt. No. 73 at 15.) In its Response, the Plan argues that a substantial portion of the services Alexis received were expressly excluded from coverage. (Dkt. No. 84 at 17.) The Plan notes that it requested itemized billing statements in order to distinguish between covered and uncovered services, but the records produced by Plaintiffs ultimately did not reflect that Alexis received mental health or substance abuse treatment at Echo Springs from a properly licensed provider. (*Id.* at 15-16.) The Plan argues it did not abuse its discretion by requesting itemized billing statements. (*Id.* at 17.) In their Reply, Plaintiffs contend the Plan failed to conduct a medical necessity review, applied an incorrect definition, and erred in its request for unbundled charges. (Dkt. No. 85 at 9-13.)

In the Plan's Final Internal Benefit Determination, it explained that "the Plan is not permitted to pay benefits unless it can verify the charged services are eligible under the terms of the governing Plan documents." (Dkt. No. 80-1 at 19.) Thus, prior to its final determination, the

Plan requested the following information: (1) medical records, demonstrating what medical services Alexis received while staying at Echo Springs; (2) an itemized bill, reflecting separate charges for the services performed at the facility; (3) documentation that the services were performed pursuant to a qualified physician's authorization and determined to be medically necessary and appropriate; and (4) documentation that Plaintiffs were charged and paid the required copayment and deductible applicable to these services. (*Id.*)

In response, Plaintiffs provided the following information: (1) progress notes from an untitled source for 08/12/2019 - 01/02/2020 (the "Progress Notes"); (2) medical records from Kaniksu Health Services for 08/14/2019, 08/29/2019, and 11/26/2019; (3) medical records from Koontenai Health for 09/19/2019 - 09/23/2019; (4) Alexis' Echo Springs Transition Study Center Application for Admission; (5) medical records from various providers in 2019; (6) a psychological evaluation from February 14, 2018; and (7) claims forms for Echo Springs dates of service 08/01/2019 - 12/31/2019. (*Id.* at 20.) The Plan conducted its review based on the existing administrative record and the additional information provided by Plaintiffs. (*Id.* at 19.)

After reviewing the totality of the administrative record, the Plan determined the submitted charges were not eligible for reimbursement. (*Id.* at 20.) The Plan explained that the documents provided by Plaintiffs did not show that medical treatment was provided to Alexis by Echo Springs. (*Id.*) The Plan considered Alexis' Progress Notes, which was the only document provided that recorded Alexis' activities and services at Echo Spring. (*Id.*) However, the Progress Notes did not identify the author's name or credentials, which the Plan found significantly limited their probative value. (*Id.*) Further, the Plan noted that the Progress Notes did not contain descriptions of psychotherapy sessions or other treatment provided to Alexis by a licensed mental health care provider at Echo Springs. (*Id.*) Based on the record, the Plan explained that "the services performed

for Alexis at Echo Springs included academic classes and tutoring, life skills classes and support, group exercise and recreation, which would not be eligible for reimbursement under any circumstances under [the] Plan." (*Id.*) The Plan also noted in a footnote that some of the documents provided by Plaintiffs were not evaluated for benefit eligibility because they included medical records from providers other than Echo Springs. (*Id.*)

As part of its explanation, the Plan also provided the relevant terms of the Plan that it considered. (*Id.* at 20-21.) The Plan acknowledged that Plaintiffs "asserted that the room, board and other services Alexis received at Echo Springs should be treated as covered services based on applying either the skilled nursing facility care or hospice care framework in parity to the services provided by Echo Springs." (*Id.* at 21.) However, the Plan was unable to review the merits of Plaintiffs' parity claim because they did not submit information sufficient for the Plan to verify that the billed charges would be covered. (*Id.*)

The Plan stated that Alexis' claim bundled billed charges for all services Echo Springs provided under code 1003, "supervised living," which was an exclusion from the Plan. (*Id.*) Because Plaintiffs failed to submit an itemized bill, the Plan did not have "an objective basis to pay benefits for certain of the bundled services even if they were adequately documented and determined to be eligible for reimbursement under the Plan by analogy to skilled nursing facility care or hospice care." (*Id.*)

Finally, the Plan explained that it had the "right to require [Plaintiffs] to provide evidence of payment for the services submitted to the Plan for reimbursement, and no such evidence has been provided to date." (*Id.*) "[T]he Plan cannot pay benefits if it cannot confirm the charges are eligible under the governing Plan documents." (*Id.*) Thus, the Plan denied Plaintiffs' appeal for benefits. (*Id.*)

After careful review of the administrative record, the Court finds that the Plan's decision was not an abuse of discretion. A plan administrator's decision to deny benefits must be based on substantial evidence. *Ellis*, 394 F.3d at 273. The court need only determine whether the decision falls "somewhere on a continuum of reasonableness – even if on the low end," and may not "substitute its own judgment for that of the plan administrator." *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 457-58 (5th Cir. 2014) (internal quotations omitted). A plan administrator's determination will only be overturned if it bears no "rational connection between the known facts and the decision." *Id.* (quoting *Holland*, 576 F.3d at 246).

Here, the Plan denied Alexis's claim because the Plan was unable to confirm the charges submitted by Alexis were eligible for reimbursement. (Dkt. No. 80-1 at 21.) The Plan explained that the Progress Notes, the only document that detailed Alexis' activities and services *at Echo Springs*, neither identified the author's name or credentials nor contained descriptions of psychotherapy sessions or other treatment provided to Alexis by a licensed mental health care provider at Echo Springs. (*Id.* at 20.) Further, the Plan was unable to review the merits of Plaintiffs' parity claim because Plaintiffs failed to submit itemized billing charges. (*Id.* at 21.) The Court cannot find from this record that the Plan's decision was either incorrect or an abuse of discretion under the arbitrary and capricious standard.

Plaintiffs argue the Plan erred in denying "Alexis' medically covered benefits" because "the custodial and educational exclusions do not apply to a supervised living placement." (Dkt. No. 73 at 17; Dkt. No. 85 at 8.) Similarly, Plaintiffs argue the Plan's decision was arbitrary and capricious because it "ignored the plain language of the custodial care definitions and applied the 'supervised living' exclusion in its final denial." (Dkt. No. 85 at 10.) This argument is without

merit because the Plan denied Alexis' claim due to the lack of documentation evidencing eligible charges from Echo Springs. (Dkt. No. 80-1 at 21.)

Further, Plaintiffs requested payment under Revenue Code 1003, Supervised Living, for Alexis' stay at Echo Springs Center. (*Id.* at 134.) The Plan has two definitions of custodial care: one with respect to Medicare and one with the respect to the Shell HSM options. Plaintiffs argue the definition of Custodial Care, with respect to the Shell HSM options, was the proper definition to apply. (Dkt. No. 85 at 9.) The Plan clearly states that "custodial care is not covered under the HSM options, except in conjunction with hospice care." (Dkt. No. 74 at 26.) Custodial care, with respect to Medicare, may include "supervised living arrangements under which little or no medical, mental health, or substance abuse treatment is being rendered." (Dkt. No. 75 at 48.) The definition of Custodial Care, with respect to the Shell HSM options, does not list supervised living arrangements. (*Id.*) While Plaintiffs argue that the definition of Custodial Care, with respect to the Shell HSM options, was the proper definition to apply, they also acknowledge that the services described in that definition were not the type of services that Alexis received. (Dkt. No. 85 at 9.) If the definition of custodial care that includes supervised living arrangements does not apply and Alexis did not receive the services covered under the other definition of custodial care, it is unclear to the Court how the Plan "ignored the plain language of the custodial care definitions." (*Id.* at 10.) Simply stating that the Plan's decision was arbitrary and capricious does not satisfy Plaintiffs' burden. *See Krishna v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, No. CV H-22-3423, 2023 WL 3887814, at *12 (S.D. Tex. June 8, 2023) (citing *Ellis*, 394 F.3d at 273) ("To successfully appeal a plan administrator's denial of a claim, a plaintiff must do more than show that substantial evidence supports her claim; she must demonstrate that the plan administrator's decision was not supported by substantial evidence.").

Plaintiffs also claim the Plan ignored the evidence that Alexis' care was medically necessary in order to reach its decision to deny benefits. (Dkt. No. 73 at 13-16; Dkt. No. 85 at 9.) This is without merit as the Plan described its review of the record and Plaintiffs' additional documents. (Dkt. No. 80-1 at 20-21.) Further, the Plan did not reach the question of whether Alexis' care was medically necessary because the documents provided by Plaintiffs did not show that medical treatment was provided to Alexis by Echo Springs. (*Id.*)

Finally, Plaintiffs argue it was not required to produce itemized billed charges. (Dkt. No. 73 at 17; Dkt. No. 85 at 12-13.) Plaintiffs provide no support for this contention. To the extent Plaintiffs claim the Plan was required to reimburse the bundled charges because they were billed according to "industry standards" and the National Uniform Billing Committee, this argument fails. (*See* Dkt. No. 73 at 19.) Per the Plan's description, it had the "right to require [Plaintiffs] to provide evidence of payment for the services submitted to the Plan for reimbursement, and no such evidence has been provided to date." (Dkt. No. 80-1 at 21.) Further, "the Plan cannot pay benefits if it cannot confirm the charges are eligible under the governing Plan documents." (*Id.*)

The Plan's review of Alexis' claim was based on the record and expressly contained the basis for the denial. Accordingly, the Court finds that the Plan's denial of Alexis' claim demonstrated enough of a "rational connection between the known facts and the decision" to survive arbitrary and capricious review. *See Meditrust*, 168 F.3d at 215.

c. <u>Anthony's Second-Level Appeal</u>

Plaintiffs argue the Plan's denial of benefits should be reversed because Anthony's stay at Excellence Academy was medically necessary and the Plan had no basis to request itemization. (Dkt. No. 73 at 17-19; Dkt. No. 85 at 9-13.) In its Response, the Plan contends that a significant portion of the services Anthony received were expressly excluded from coverage. (Dkt. No. 84 at

15.) The Plan notes that it requested itemized billing statements in order to distinguish between covered and uncovered services and argues that it did not abuse its discretion by doing so. (*Id.* at 16-17.)

In the Plan's Final Internal Benefit Determination, it explained that "the Plan is not permitted to pay benefits unless it can verify that the charged services are eligible under the terms of the governing Plan documents." (Dkt. No. 78-2 at 119.) Thus, prior to its final determination, the Plan requested the following information: (1) an itemized bill, reflecting separate charges for the services performed at the Excellence Academy; (2) documentation that the services were performed pursuant to a qualified physician's authorization and determined to be medically necessary and appropriate; and (3) documentation that Plaintiffs were charged and paid the required copayment and deductible applicable to these services. (*Id.*)

In response, Plaintiffs provided the following information:

> 1. A revised invoice from Return to Excellence Academy, reflecting individual psychotherapy sessions as an itemized charge, and bundled charges for the remainder of services provided by the facility, including room and board, academic support, personal health support, work skills, healthy life skills & recreation.
>
> 2. A letter dated November 26, 2020, which [the Plan] note[d] appear[ed] to be postdated, from Doug Ratelle as Clinical Director of Return to Excellence Academy, who [the Plan] underst[oo]d to be a Ph.D. licensed psychologist, providing additional information about Anthony's health status and the services provided at the facility.

(*Id.*)

Upon receipt of the additional information, the Plan instructed Beacon to re-process Anthony's claim. (*Id.*) As a result, Beacon identified the itemized individual psychotherapy sessions as eligible for reimbursement and found the remainder of the services were not covered

under the Plan. (*Id.* at 120.) The Plan then conducted its final internal benefit determination by considering the totality of the administrative record. (*Id.*)

The Plan determined itemized charges for individual psychotherapy sessions were eligible for reimbursement. (*Id.*) With respect to the remaining billed charges, the Plan acknowledged that Plaintiffs "asserted that the room, board and other services Anthony received at Excellence Academy should be treated as covered services based on applying either the skilled nursing facility care or hospice care framework in parity to intermediate-level mental health care provided at a transitional living facility." (*Id.*) However, while the Plan was prepared to review the merits of Plaintiffs' parity claim, it was unable to do so because Plaintiffs did not submit sufficient information for the Plan to verify that the billed charges would be covered. (*Id.*)

The Plan stated that "[t]he invoice [Plaintiffs] submitted [did] not itemize any charges beyond the individual psychotherapy sessions." (*Id.*) It further explained that "at least a portion of the bundled charges (i.e., academic support, work skills, healthy life skills and recreation) would not be eligible for reimbursement under any circumstances under our Plan." (*Id.* at 121.) Without an itemized bill, the Plan maintained that it did not have "an objective basis to pay benefits for certain of the bundled services (i.e., room and board, personal health support) even if they were determined to be eligible for reimbursement by analogy to skilled nursing facility care or hospice care." (*Id.*) Thus, because the Plan cannot pay for charges that it cannot confirm are eligible, the Plan denied Plaintiffs' appeal for benefits. (*Id.*)

After careful review of the administrative record, the Court finds that the Plan's decision was not an abuse of discretion. A plan administrator's determination will only be overturned if it bears no "rational connection between the known facts and the decision." *McCorkle*, 757 F.3d at 457-58 (quoting *Holland*, 576 F.3d at 246). Here, the Plan denied a portion of Anthony's claim

15 / 18

because the Plan was unable to determine whether the unbundled charges submitted were eligible for reimbursement. (Dkt. No. 78-2 at 120-21.) The Plan explained that Plaintiffs did not submit documentation for itemized charges beyond the individual psychotherapy sessions, which the Plan was able to determine were eligible for reimbursement. (*Id.*) As a result, the Plan could not review the merits of Plaintiffs' parity claim. (*Id.* at 120.) The Plan reasoned that it cannot pay for charges that it cannot confirm are eligible. (*Id.* at 121.) Thus, the Court cannot find from this record that the Plan's decision was either incorrect or an abuse of discretion under the arbitrary and capricious standard.

Plaintiffs argue the Plan's denial of benefits should be reversed because Anthony's stay at Excellence Academy was medically necessary. (Dkt. No. 73 at 18-19; Dkt. No. 85 at 11.) This argument is without merit. The Plan's decision to deny a portion of Anthony's claim was due to a lack of documentation evidencing charges eligible for reimbursement. (Dkt. No. 78-2 at 120-21.) The Plan did not reach the question of whether Anthony's stay at Excellence Academy was medically necessary.

Further, Plaintiffs generally argue the Plan applied the incorrect custodial care definition to Anthony's claim. (Dkt. No. 85 at 9-10.) Plaintiffs contend the definition of Custodial Care, with respect to the Shell HSM options, was the proper definition to apply. (*Id.* at 9.) Plaintiffs requested payment under Revenue Code 1003, Supervised Living, for Anthony's stay at Excellence Academy. (Dkt. No. 80-1 at 332.) While Plaintiffs argue that the definition of Custodial Care, with respect to the Shell HSM options, was the proper definition to apply, they also acknowledge that the services described in that definition were not the type of services that Anthony received. (Dkt. No. 85 at 9.) If the definition of custodial care that includes supervised living arrangements does not apply and Anthony did not receive the services covered under the other definition of custodial

care, it is unclear to the Court how the Plan "ignored the plain language of the custodial care definitions." (*Id.* at 10.) Simply stating that the Plan's decision was arbitrary and capricious does not satisfy Plaintiffs' burden. *See Krishna*, 2023 WL 3887814, at *12 (citing *Ellis*, 394 F.3d at 273) ("To successfully appeal a plan administrator's denial of a claim, a plaintiff must do more than show that substantial evidence supports her claim; she must demonstrate that the plan administrator's decision was not supported by substantial evidence.").

Plaintiffs also argue that the Plan had no basis to request itemization. (Dkt. No. 73 at 17, 19; Dkt. No. 85 at 11, 13.) Plaintiffs claim the bundled charges were billed according to "industry standards" and the National Uniform Billing Committee. (Dkt. No. 73 at 19.) However, as explained in the final determination, the Plan had the "right to require [Plaintiffs] to provide evidence of payment for the services submitted to the Plan for reimbursement, and no such evidence has been provided to date." (*Id.*) "[T]he Plan cannot pay benefits if it cannot confirm the charges are eligible under the governing Plan documents." (*Id.*)

The Plan's review of Anthony's claim was based on the record and expressly contained the basis for the denial. Accordingly, the Court finds that the Plan's denial of Anthony's claim demonstrated enough of a "rational connection between the known facts and the decision" to survive arbitrary and capricious review. *See Meditrust*, 168 F.3d at 215.

### IV.  CONCLUSION

Based on the briefing, record, and relevant law, the Court **RECOMMENDS** Plaintiffs' Motion for Judgment on the Record (Dkt. No. 73) be **DENIED** and the Plan's Cross-Motion for Judgment (Dkt. No. 84) be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant

to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the Undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas on November 7, 2023.

Sam S. Sheldon
United States Magistrate Judge